UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GARY A. GRAY,<br>*Plaintiff*,<br><br>v.<br><br>NED LAMONT, et al.,<br>*Defendants*. | No. 3:21-cv-00143 (VAB) |

**RULING ON MOTION FOR TEMPORARY RESTRAINING ORDER**

Gary A. Gray ("Plaintiff"), currently incarcerated at Osborn Correctional Institution, filed this Complaint *pro se* under 42 U.S.C. § 1983, challenging his medical care. Mr. Gray has filed two motions seeking temporary injunctive relief.[1]

Mr. Gray's first motion seeks pain medication for Mr. Gray's knees and treatment for a mass in his chest. Mot. for TRO, ECF No. 4 (Feb. 3, 2021) ("First Mot."). The second motion seeks treatment for a "bump" on the back of knee that was bleeding sometime in 2021, lumps on

---

[1] The motions were drafted by another inmate, Raymond Cerilli, and include general allegations regarding Mr. Gray's medical issues and many allegations and requests pertaining to Mr. Cerilli. As Mr. Cerilli is not a party to this action, he cannot seek or obtain any relief. *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n. 5 (1992) (noting that "it is not likely that an agency would feel compelled to accede to the legal view of a district court expressed in a case to which it was not a party; redressability clearly did not exist."). As a result, any requests asserted on behalf of Mr. Cerilli will not otherwise be addressed by this Court, and to the extent they are properly before it, they are denied. Moreover, any future filings including the claims of any other inmate may result in any such filing being stricken in its entirety. Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter . . . [acting] on its own."); *Lord v. Int'l Marine Ins. Servs.*, No. 3:08-CV-1299 JCH, 2012 WL 45440, at *2 (D. Conn. Jan. 9, 2012) ("Rule 12(f) permits the court to strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter [and] [t]he court may act *sua sponte*." (internal quotation marks and citations omitted)).

1

his body, a mass in his chest for which he has been unable to have a biopsy for over a year, and possible diabetes or kidney disease. Mot. for TRO, ECF No. 8 (Feb. 9, 2021) ("Second Mot.").

For the following reasons, Mr. Gray's motions are **DENIED**.

## I.     BACKGROUND

Based on medical records provided by the Defendants, Mr. Gray has a history of Stage 4 follicular lymphoma, which is currently in remission. Ex. A to Defs.' Obj. to Pl.'s Mot. for TRO (ECF No. 8) and Resp. to the Court's Order (ECF No. 17), ECF No. 21 at 407 (May 7, 2021). An October 2015 chest CT scan showed a negative result for metastatic disease and January 2018 blood tests were normal. *Id.* In 2017, Mr. Gray apparently refused to attend a hematology/oncology consult, but did attend one in June of 2018. *Id.* at 407, 388-93. Blood tests conducted in June 2018 showed no indications of recurrent cancer. *Id.* at 399-406.

Mr. Gray allegedly told the specialist about a lump on the back of his head and complained of headaches. *Id.* at 389. The specialist recommended checking LDH levels and a PET/CT scan. *Id.* at 393. If the scan was negative, the specialist recommended annual surveillance, but if it was positive, the specialist recommended a biopsy and lumbar puncture to evaluate for cerebrospinal lymphoma. *Id.* The specialist also recommended an eye exam to determine whether Mr. Gray's headaches were caused by eye strain. *Id.* Finally, the specialist recommended a follow-up appointment after the PET/CT scan was performed. *Id.* Mr. Gray allegedly refused to go to the UConn Health Center for the PET scan. *Id.* at 385-86. Apparently, he did not need the test and would not consent even when the purpose of the scan was explained to him.  *Id.* at 386.

Mr. Gray attended a sick call appointment on July 5, 2018, but did not mention his oncology consult, headaches, or the lump on his head. *Id.* at 382-84. Blood tests on July 10, 2018, showed no indication of diabetes or kidney disease. *Id.* at 374-75.

On July 17, 2018, Mr. Gray met with Dr. Ashraf about his complaints of chronic pain and arthritis in his knees. *Id.* at 360-73. Dr. Ashraf renewed Mr. Gray's bottom bunk pass. *Id.* at 368-72, 377. Dr. Ashraf also spoke to Mr. Gray about the PET scan, but Mr. Gray allegedly continued to refuse the appointment, stating that he did not want to wait for "long hours" to attend the appointment. *Id.* at 358. In August 2018, Mr. Gray allegedly attended another sick call appointment, but again did not mention his oncology appointment or the lump on his head. *Id.* at 349-51. On September 4, 2018, Mr. Gray allegedly refused to attend his oncology appointment. *Id.* at 348.

In December 2018, Mr. Gray saw an optometrist and he was ordered prescription glasses. *Id.* at 340-41. Although his ocular pressure was normal, Mr. Gray was referred to an ophthalmologist for evaluation of possible angle closure glaucoma in response to his complaints of head and eye pain. *Id.* at 334, 338-39, 341.

On February 1, 2019, Mr. Gray allegedly told a nurse that he now wanted the PET scan. *Id.* at 336. On February 25, 2019, he discussed the PET scan and oncology appointment with Dr. Ashraf and said he wanted to attend both appointments. *Id.* at 327. Dr. Ashraf agreed to submit a new request for the PET scan. *Id.* During Dr. Ashraf's examination, Mr. Gray allegedly denied any back or joint pain, swelling, cramps, weakness, stiffness, or arthritis. *Id.* at 328. Mr. Gray also allegedly denied any headache. *Id.* Dr. Ashraf noted that Mr. Gray had a full range of motion in all extremities with no obvious weakness and no gait abnormalities. *Id.* Despite the

3

lack of symptoms, Dr. Ashraf ordered large knee braces and an x-ray of Mr. Gray's lumbar spine. *Id.* at 327.

The x-ray, taken on March 7, 2019, showed only mild degenerative disease at L1-L2, an anterior disc osteophyte complex at L1-L2, and degenerative changes in his bilateral hips. *Id.* at 323. The ophthalmologist found no sign of angle closure glaucoma and reported a healthy ocular exam. *Id.* at 316. He recommended a medical follow-up to deal with Mr. Gray's headaches. *Id.* On March 27, 2019, Mr. Gray met with APRN Rodney to discuss the x-ray results and his headaches. *Id.* at 309. Mr. Gray was described as alert and oriented, with normal pupil and eye movement, normal face symmetry, and normal range of motion in his neck. *Id.* APRN Rodney gave Mr. Gray a dose of medication for nerve pain and noted a plan to monitor him for recurrence of symptoms. *Id.* at 308.

On April 8, 2019, Mr. Gray allegedly refused to attend his CT scan appointment because he would not be taken there by special transport. *Id.* at 305-06. Mr. Gray underwent the CT scan of his chest and abdomen on May 3, 2019. *Id.* at 294-97. The scans were unremarkable noting only a small 6 mm groundglass nodule in the upper left lung lobe that was unchanged from the previous scan in October 2015. *Id.* at 297.

Mr. Gray's knee brace pass was renewed on June 4, 2019. *Id.* at 293. On June 27, 2019, Mr. Gray met with APRN Charles and allegedly complained that the lump on his head had increased in size over the past two years and was associated with "on and off" daily headaches lasting four to five hours. *Id.* at 269, 280. He also mentioned right eye pain and twitching. *Id.* at 280. Mr. Gray allegedly said he injured his left knee as a child which caused his chronic knee pain and need for braces. *Id.* APRN Charles noted that Mr. Gray had not yet received the PET

4

scan recommended by the hematology/oncology specialist or had a follow-up visit with the specialist. *Id.* at 269. APRN Charles noted that the lump on Mr. Gray's head was a 5 cm soft nodule that was tender to palpation. *Id.* She ordered lab tests, again referred Mr. Gray for a PET scan and hematology/oncology follow-up, and annual hematology/oncology referrals. *Id.* at 269-79. She increased Mr. Gray's Amitriptyline dose to 50 mg, to address the headaches. *Id.* at 269, 283. Regarding the bump, APRN Charles ordered an LDH level test and basic blood work to evaluate the possible need for a biopsy of the bump. *Id.* at 269-79.

Mr. Gray's bloodwork was largely unremarkable. *Id.* at 224-64. His LDH level was normal indicating an absence of indicators for possible recurrence of lymphoma and metastases. *Id.* at 237. APRN Charles met with Mr. Gray to discuss the results and ordered a digital prostate exam to address a slightly elevated PSA level, medication to address elevated LDL cholesterol, and other tests for care relating to high blood pressure and other chronic issues. *Id.* at 237, 216. The prostate exam showed no evidence of nodules or ulceration of the prostate and there was no blood in his stool. *Id.* at 212.

Mr. Gray met with Dr. Wright in August 2020. *Id.* at 203-10. X-rays of Mr. Gray's knees showed degenerative changes. *Id.* at 206. Dr. Wright also ordered x-rays of Mr. Gray's lumbar area in response to complaints of lower back pain. *Id.* at 205.

Mr. Gray's hypertension was the focus of his chronic care appointment on August 23, 2020. *Id.* at 194-200. Compliance with treatment plans and healthy commissary dietary choices also were discussed. *Id.* at 196. Mr. Gray was observed to have full range of motion in all extremities without obvious weakness, and no gait abnormalities. *Id.* at 198. Mr. Gray was given

a vitamin D supplement to address his vitamin D deficiency. *Id.* at 199-200. Additional bloodwork, which proved largely unremarkable, was ordered. *Id.* at 199-200, 117-80.

Mr. Gray met with a medical provider on September 13, 2020 regarding chronic pain and osteoarthritis. *Id.* at 105-10. The provider noted that Mr. Gray's pain was likely due to osteoarthritis and osteophytes and replaced Mr. Gray's ibuprofen prescription with a prescription for the anti-inflammatory Mobic. *Id.* at 106. At the appointment, Mr. Gray was observed to have full range of motion in all extremities without obvious weakness and a normal gait. *Id.* The medical provider discussed the difference between "wants" and "needs" with Mr. Gray and discussed his treatment options. *Id.* On October 20, 2020, Mr. Gray allegedly again refused to attend an appointment at the UConn Health Center. *Id.* at 93.

On November 21, 2020, Mr. Gray had an emergency appointment with a nurse for complaints of severe upper left back pain. *Id.* at 91. He allegedly had been experiencing the pain for two days, but a hot pack alleviated the pain. *Id.* The on-call physician ordered medication for pain. *Id.* at 91-92. Mr. Gray met with a medical provider the following day for his severe upper back pain and neck stiffness. *Id.* at 85. He was given a Ketorolac injection and ibuprofen for pain. X-rays also were ordered. *Id.*

On November 23, 2020, Mr. Gray allegedly told a nurse that the pain medications were not working. *Id.* at 80. That same day, Dr. Wright discontinued the Mobic prescription and provided a course of acetaminophen-codeine. *Id.* at 76-78. Mr. Gray was also given an external muscle rub to relieve his pain. *Id.* at 75.

The November 23, 2020 x-ray showed no degenerative changes in the scapula. *Id.* at 74. The cervical spine x-ray showed mild degenerative disc disease at C5-C6. *Id.* at 72. On

6

November 24, 2020, Dr. Wright discussed the x-ray results and medication changes with Mr. Gray and said he would have a follow-up medical appointment. *Id.* at 71.

On December 1, 2020, Mr. Gray met with a nurse for complaints of continued neck pain, which cycled on and off, and left arm numbness. *Id.* at 70. Mr. Gray allegedly walked normally with no facial grimacing. *Id.* The nurse provided ibuprofen and referred him to the doctor. *Id.* Mr. Gray met with a medical provider about his neck pain on December 3, 2020. *Id.* at 59-63. The medical provider ordered conservative treatment with a short course of pain medication, acetaminophen-codeine, and a follow-up visit. *Id.* at 62. The medical provider also discussed stretching and strengthening exercises. *Id.*

On February 11, 2021, Mr. Gray allegedly again refused an outside appointment. *Id.* at 53. On February 14, 2021, he allegedly believed that he should go to UConn Health Center appointments by special transport and refusing to attend all appointments until he was accommodated. *Id.* at 51-52. The nurse noted that Mr. Gray was not a candidate for special transport. *Id.*

March 2021 test results showed that Mr. Gray's LDL cholesterol level had risen, and his vitamin D level decreased, indicating that Mr. Gray perhaps had been noncompliant with his treatment plan. *Id.* at 19. APRN Heap discussed these results with Mr. Gray on March 25, 2021. *Id.* at 15.

## II.   STANDARD OF REVIEW

Courts in this Circuit apply the same standard to motions for temporary restraining order and preliminary injunction. *Local 1814, Intern. Longshoremen's Ass'n, AFL-CIO v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992). Interim injunctive relief "is an

extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Grand River Enterprise Six Nations Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks and citations omitted). To prevail, the plaintiff must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Glossip v. Gross*, 576 U.S. 863, 876 (2015) (internal quotation marks and citation omitted).

"[T]he court's task when granting a preliminary injunction is generally to restore, and preserve, the status quo ante, *i.e.*, the situation that existed between the parties immediately prior to the events that precipitated the dispute." *Asa v. Pictometry Intern. Corp.*, 757 F. Supp. 2d 238, 243 (W.D.N.Y. 2010); *Transamerica Rental Finance Corp. v. Rental Experts*, 790 F. Supp. 378, 381 (D. Conn. 1992) ("It is well established in this Circuit that the purpose of a preliminary injunction is to preserve the *status quo* between two parties."). "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *North Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (quoting *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). "A mandatory preliminary injunction 'should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from the denial of preliminary relief.'" *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2001) (quoting *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010)).

The district court has "wide discretion" in determining whether to grant preliminary injunctive relief. *Moore v. Consolidated Edison Co. of N.Y., Inc.*, 409 F.3d 506, 511 (2d Cir. 2005). "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 846-47 (1994). The Supreme Court has repeatedly stated that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.*

### III.  DISCUSSION

To obtain preliminary injunctive relief, Mr. Gray must show that irreparable harm is likely if the Court denies his request. *See id.* And allegations of irreparable harm or claims of a likelihood of success on the merits must be substantiated with admissible evidence. *Torrez v. Semple*, No. 3:17-cv-1223 (SRU), 2017 WL 6624009, at *1 (D. Conn. Dec. 28, 2017) ("Allegations of irreparable harm or claims of a likelihood of success on the merits must be substantiated with evidence in admissible form."); *see also Cox v. Morley*, No. 9:20-CV-1235 (GLS/CFH), 2020 WL 6781522, at *10 n.13 (N.D.N.Y. Nov. 18, 2020) ("[A]ny renewed request for injunctive relief must be supported by evidence, as opposed to mere allegations, showing that the alleged irreparable harm is imminent."); *Hancock v. Essential Res., Inc.*, 792 F. Supp. 924, 928 (S.D.N.Y. 1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals.").

9

In opposition to Mr. Gray's motion, however, Defendants have submitted copies of Mr. Gray's medical records and the declaration of Dr. Cary Freston, the Acting Regional Medical Director for the Department of Correction. Defs.' Obj. to Pl.'s Mot. for a TRO (ECF No. 8) and Resp. to the Court's Order (ECF No. 17), ECF No. 20 (May 7, 2021) ("Defs.' Obj."). They argue that Mr. Gray fails to demonstrate irreparable harm or a likelihood of success on the merits of his claim. *Id.* at 1.

Dr. Freston noted that much of Mr. Gray's pain is caused by osteoarthritis, which causes localized pain or stiffness without corresponding motor deficits. Ex. B to Defs.' Obj. to Pl.'s Mot. for a TRO (ECF No. 8) and Resp. to the Court's Order (ECF No. 17), ECF No. 20-2 ¶ 57 (May 7, 2021) ("Freston Decl."). Treatment for osteoarthritis is intended to maintain functional abilities, not eliminate all pain. *Id.* ¶ 58. Treatments include neuropathic pain relievers, oral or topical anti-inflammatories, topical or oral analgesics, stretching exercises, and warm compresses, all of which have been provided or recommended to Mr. Gray. *Id.* ¶¶ 58-59.

Dr. Freston states that Mr. Gray's x-rays and medical examinations do not show a need for his current knee brace, let alone the metal hinged knee brace he seeks. *Id.* ¶ 60. No medical reports note any difficulties with range of motion or ambulation. Dr. Freston cautions that continued use of a brace can accelerate muscular degeneration and cause permanent dependence on the brace. *Id.*

In Defendants' view, Mr. Gray's blood work shows no indications of diabetes or kidney disease. Defs.' Obj. at 23. Minor conditions are being treated and test results show that Mr. Gray likely has not been compliant with his treatment plan. Freston Decl. ¶ 62.

As to Mr. Gray's concerns that his cancer may have returned, his medical records arguably do not support a recurrence. *Id.* ¶ 63. With respect to his concerns about the bump on his head, Mr. Gray allegedly has refused to comply with recommendations for a PET scan and follow-up visit with the specialist. *Id.* ¶ 64. And no tests conducted so far support an inference that his cancer has returned. *Id.* The 2019 CT scan showed that the lump in his chest was unchanged from 2015. *Id.* ¶ 65. Dr. Freston notes that this lack of change indicates that the nodule is benign and not a cancerous growth. *Id.* Finally, Mr. Gray mentions a bleeding lump on the back of his knee, but there is no mention of this lump in over 400 pages of medical records.

As a result, thus far, Defendants' submission suggest that Mr. Gray has been provided proper treatment for his medical conditions. Moreover, there is some suggestion that Mr. Gray has consistently refused some tests and appointments, and has been noncompliant with other prescribed treatment. In other words, on this record, there is nothing to suggest that there is a viable deliberate indifference claim warranting immediate relief, and instead there appears to be a difference of opinion about the proper course of medical treatment for many of Mr. Gray's underlying health conditions. Leaving aside, for now, whether there is a viable deliberate indifference claim at all, there is no basis for suggesting that preliminary injunctive relief is warranted. *Cf. Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim"); *Mena v. City of N.Y.*, No. 13-CV-2792 (NGG) (SJB), 2018 WL 4328827, at *5 (E.D.N.Y. Sept. 11, 2018) (granting summary judgment on pretrial detainee's claim of medical deliberate indifference where he had shown no more than he disagreed with course of treatment he received); *but see Chance*, 143 F.3d at 703–04 (noting a medical provider may be deliberately

11

indifferent by consciously providing an inmate with "an easier and less efficacious" treatment plan, particularly if the provider does so because of ulterior motives, such as improper "monetary incentives.").

Accordingly, having failed to demonstrate irreparable harm or a likelihood of success on the merits, Mr. Gray's motion for a temporary restraining order or any other preliminary injunctive relief will be denied.

## IV. CONCLUSION

Mr. Gray's motions for Temporary Restraining Order are **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 21st day of May 2020.

                                        /s/ Victor A. Bolden
                                        Victor A. Bolden
                                        United States District Judge